**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

MARY WILLMAN,

                                    Plaintiff,                        Civil No. 21-1724 (JRT/JFD)

v.
                                                          **MEMORANDUM OPINION AND ORDER**
FARMINGTON AREA PUBLIC SCHOOL                    **GRANTING IN PART AND DENYING IN**
DISTRICT (ISD 192) and MEGAN BLAZEK,            **PART DEFENDANTS' MOTION FOR**
                                                          **SUMMARY JUDGMENT**

                                    Defendants.

---

Stacey R. Everson and Stephen W. Cooper, **THE COOPER LAW FIRM CHARTERED**, 1201 Yale Place, Suite A-100, Minneapolis, MN 55403, for plaintiff.

Amy E. Mace and Michael J. Ervin, **RUPP, ANDERSON, SQUIRES & WALDSPURGER, P.A.**, 333 South Seventh Street, Suite 2800, Minneapolis, MN 55402, for defendants.

Plaintiff Mary Willman is a special education teacher who was terminated by Defendant I.S.D. No. 192 Farmington Area School District (the "District"). Willman sued the District asserting five claims against it and Defendant Megan Blazek—the principal at Willman's school—alleging discrimination, interference, and retaliation in violation of both state and federal law.

Only the interference, retaliation, and defamation claims remained after the Defendants' motion to dismiss, and Defendants have now moved for summary judgment on those claims. The Court will grant summary judgment as to the interference claim

because Willman received the full extent of the benefit she was entitled to under the Family Medical Leave Act ("FMLA").  The Court will also grant summary judgment on the FMLA and workers' compensation retaliation claims because Willman does not present direct evidence of retaliation, cannot establish a prima facie case of retaliation, and because the District's reasons for termination are facially legitimate and Willman did not present sufficient evidence of pretext.

Finally, the Court will deny Defendants' Motion for Summary Judgment as to the defamation claim because Willman has raised a material issue of fact regarding the truth of some of the statements provided to the School Board (hereinafter "the Board") and whether Defendants acted with ill will towards Willman when they presented the findings of their investigation.  The Court will grant summary judgment as to the Americans with Disability Act ("ADA") disability discrimination claim for failure to prosecute the claim.

## BACKGROUND

### I.   FACTS

Plaintiff Mary Willman is an experienced special education teacher.  (Notice of Removal, Ex. 1 ("Compl."), ¶ 5, July 29, 2021, Docket No. 1-1.)  Willman was employed by the Farmington Area School District (ISD 192) (the "District").  (Compl. ¶ 4.)  Willman was initially hired as a substitute teacher in March 2018 and became a full-time special education teacher at Boeckman Middle School for the 2018–2019 school year.  (Decl. Pl. Mary Willman ("Willman Decl.") ¶¶ 5–7, Sept. 16, 2022, Docket No. 50-1.)  Defendant Megan Blazek was the principal at Boeckman Middle School.  (Compl. ¶ 3.)

### A. 2018-2019 School Year Concerns

In November 2018, the parent of a student in Willman's classroom complained that there was, among other issues, a "lack of instruction and supervision" for the student. (Defs.' Mot. Summ. J., Ex. 2, at 109, Aug. 8, 2022, Docket No. 41-1.) In December, the District arranged for another special education teacher to observe Willman's classroom because of the student's challenges. (Defs.' Mot. Summ. J., Ex. 3, at 111–12.) The teacher provided Willman with a list of "strategies/options" to follow in her classroom. (Defs.' Mot. Summ. J., Ex. 1, at 52–53.)

In November 2018 and January 2019, Principal Blazek observed Willman's performance and evaluated her teaching. (*See* Defs.' Mot. Summ. J., Ex. 1, at 45–51.) On January 10, 2019, Assistant Director of Special Services Craig Mares observed Willman lead a Formal Evaluation/Individualized Education Program ("IEP") meeting with a student's family. (Defs.' Mot. Summ. J., Ex. 1, at 40–41.) Mares noted various concerns in his report. (*Id.*)

In February 2019, one of Willman's students was left sleeping in Willman's classroom and found wandering the hallways an hour after buses had left. (Defs.' Mot. Summ. J., Ex. 26, 165:8–22, at 510.) The District investigated the incident and interviewed Willman, but did not specifically find that it was her fault. (*Id.*; Defs.' Mot. Summ. J., Ex. 5, at 117–18.) However, Willman was instructed to implement a "checkout system" to ensure students got on the bus safely. (Defs.' Mot. Summ. J., Ex. 29, 53:3–25, at 1632.)

As a fourteen-year veteran teacher, Willman is entitled to tenure at the conclusion of her first year at a new district.  Minn. Stat. § 122A.40, subd. 5(a).  However, at the conclusion of the 2018-2019 year, rather than offer Willman employment for the second year—and thus grant her tenure—the District placed her on a one-year probationary period because of performance concerns.  (Defs.' Mot. Summ. J. Ex. 26, at 243:1–12.) Willman was reassigned to teach at the elementary school level in May 2019, at which point Willman and the District entered into an agreement extending the probationary period to "further evaluat[e] and assess[] her teaching skills and knowledge based on her new assignment."  (Defs.' Mot. Summ. J. Ex. 1, at 58.)

### B.  2019-2020 School Year Concerns

In October 2019, the same parent who had complained during the 2018-2019 school year again complained about Willman.  (Defs.' Mot. Summ. J., Ex. 7, at 122–23.) Principal Blazek communicated to Alisha Dalsin, the new Assistant Director of Special Services, that "this was one of the areas [Willman] needed to improve in, so at this point we may need to put her on an improvement plan."  (*Id.*)

On October 10, 2019, Willman notified the District via email that she would be having surgery on her right hand because of a work related injury.  (Defs.' Mot. Summ. J., Ex. 8, at 124.)  In December 2018, a student had injured Willman's hand, resulting in her wearing a brace, and needing physical therapy and medical care.  (Willman Decl. ¶ 9.)  On October 30, 2019, Willman submitted her formal request for a leave of absence.  (Defs.' Mot. Summ. J., Ex. 1, at 100.)

-4-

On November 4, 2019, Alisha Dalsin contacted Willman to review her Performance Improvement Plan.  (Defs. Mot. Summ. J., Ex. 9, at 126.)  The two met on November 7.  (Defs.' Mot. Summ. J., Ex. 1, at 37.)  The Performance Improvement Plan addressed a number of areas, including communications with parents regarding IEP goals and objectives, directing paraprofessionals, and informing general education teachers of students' unique needs and behavior management techniques.  (*Id.*)

On November 6, 2019, Principal Blazek told Willman that she would not sign the leave of absence paperwork until Willman found a substitute and specified when she would return from surgery.  (Defs.' Mot. Summ. J., Ex. 25, 165:16–168:16, at 288.)  Willman claims that it was then that Principal Blazek yelled at her and told her "you are too old to do this job."  (*Id.* 165:16–21.)  That same day, Willman's leave of absence was officially approved for six weeks.  (Defs.' Mot. J., Ex. 1, at 100.)  On November 8, Willman submitted her formal FMLA application for six weeks.  (Defs.' Mot. Summ. J., Ex. 1, at 98–99.)  The application was approved, and the leave commenced on November 12, 2019, and was scheduled through December 20, 2019.  (*Id.* at 36.)  Willman points out that despite approving her leave, the District appeared to be irritated about her FMLA leave request because on November 8, 2019, HR Director MaryAnn Thomas emailed another HR staff member regarding Willman's injury saying, "Longest carpel tunnel recovery I ever did see for a teacher who we could accommodate with little wrist use."  (Decl. Stacey Everson ("Everson Decl."), Ex. P, at 36, Nov. 4, 2022, Docket No. 61-1.)  Later, Willman

requested an extension through January 12, 2020, with a note from her doctor, and the District extended the leave. (Defs.' Mot. Summ. J., Ex. 1, at 27, 93.)

On November 14, a paraprofessional with experience working with Willman emailed Principal Blazek requesting to share concerns about Willman's classroom. (Defs.' Mot. Summ. J., Ex. 10, at 128.) The two met on November 18. (*Id.* at 127.) Principal Blazek took detailed notes of the paraprofessional's concerns. (Defs.' Summ. J., Ex. 11, at 129.)

In December 2019, while Willman was on FMLA leave, one of her students exposed himself to a group of students in the bus corral. (Defs.' Mot. Summ. J., Ex. 26, 220:22–221:12, at 565–66.) Principal Blazek investigated the incident and learned that the student regularly put his hands down his pants. (Defs.' Mot. Summ. J., Ex. 12, at 132.) At least one of the general education teachers told Principal Blazek that Willman did not notify him of the student's issue or how to address it. (*Id.* at 131.)

On December 17, 2019, the District sent Willman a letter detailing concerns they wanted to address with her. (Defs.' Mot. Summ. J., Ex. 1, at 35.) The letter identified four areas of performance deficiencies: (1) failure to identify specific plans to address inappropriate student behavior and to inform general education teachers of behavior management techniques; (2) failure to provide leadership and instructional guidance to paraprofessionals; (3) failure to communicate IEP goals and objectives with families; and

(4) failure to provide appropriate programming and instruction to support student progress. (*Id.*)

### C. Termination

On January 7, 2020, while Willman was still on her leave of absence, Principal Blazek and Assistant Director Dalsin met with Willman to discuss their performance concerns. (Defs.' Mot. Summ. J., Ex. 14, at 136–138.)  They asked her about the student who had exposed himself, her students' social skills goals and objectives, how she prepared her long-term substitute, the check-out procedure for students, and how she tracked student progress. (*Id.*)

Dissatisfied with the meeting, the District placed Willman on paid administrative leave while they conducted follow-up with other staff members. (Defs.' Mot. Summ. J., Ex. 27, 127:13–17, at 916.)  The staff contradicted some of Willman's claims and corroborated some of the District's concerns. (Thomas Decl. ¶ 11; Defs.' Mot. Summ. J., Ex. 15, at 139.) Specifically, a teacher indicated that contrary to Willman's assertion, there was no clipboard with a checkout procedure and there was no way to track student progress. (Defs.' Mot. Summ. J., Ex. 15, at 139.)  The District requested that Willman submit the notebook she claimed to use to track student progress, but she never did. (Thomas Decl. ¶ 9.)  The District's investigation also involved a review of her special education paperwork. (Defs.' Mot. Summ. J., Ex. 28, 211:19–212:11, at 1437–38.)

On January 28, the District sent Willman a letter informing her of their intent to terminate her and outlining the reasons.  (*See* Defs.' Mot. Summ. J., Ex. 1, at 6–10.)  The termination letter to Willman included a list of reasons for her termination, including:

- failure to implement any of the strategies or suggestions from the experienced special education teacher assigned to observe her in the 2018-2019 school year;

- lack of improvement during the latter half of the 2018-2019 school year;

- lack of improvement in the first half of the 2019-2020 school year after being placed on probation;

- repeated parent concerns about lack of knowledge of IEP goals;

- inability to identify specific goals or objectives for her students during the investigative interview;

- failure to provide the notebook showing how she tracks students' progress;[1]

- failure to deliver individualized instruction to students;

- failure to instruct paraprofessionals;

---

[1] Willman claims the notebook was stolen in a home invasion.  (Defs.' Mot. Summ. J., Ex. 26, 270:4–19, at 615.)

- deficient IEP documentation and failure to ensure all students needs are addressed in their IEPs;

- failure to ensure that students were educated in the least restrictive environment;

- failure to address the student exposing himself;

- failure to implement the student dismissal procedure as directed;

- failure to prepare long-term substitute teacher; and

- untruthfulness and insubordination.

(*Id.*)  On February 10, 2020, the Board officially voted to discharge her.  (*Id.* at 1.)  The District notified Willman of her termination in a letter sent on February 11, 2020.  (*Id.* at 1–3.)  The District's formal notice of termination does not state the reasons for Willman's termination, but references the letter sent to Willman on January 28, 2020, setting forth the reasons.  (*Id.* at 1.)

Willman disputes many of the District's reasons for termination and argues that the District knowingly and maliciously made false statements about her performance.  For example, Willman alleges that a staff member told the District that Willman had in fact used a clipboard procedure to checkout students—contrary to their representation to the Board.  (Defs.' Mot. Summ. J., Ex. 27, 186:8–187:10, at 975–76.)  Willman also argues that the District misled the Board about her evaluation.  (Everson Decl., Ex. DD, 54:11–55:1.,

at 106, Nov. 4, 2022, Docket No. 61-3.)  Willman also alleges that the District mislead the Board about her alleged failure to implement strategies from the experienced teacher and whether she was required to implement them.  (Willman Decl. ¶¶ 20–21.)

### D.  PELSB and EEOC Submissions

After terminating Willman, the District submitted a mandatory report to the Minnesota Professional Educator Licensing and Standards Board ("PELBS").  (*See* Defs.' Mot. Summ. J., Ex. 18, at 146.)  PESLB requested additional documentation and the District provided a response detailing their reasons for the termination.  (*See* Defs.' Mot. Summ. J., Exs. 19–20, at 147–203.)

Willman filed a Charge of Discrimination with the Equal Opportunity Employment Opportunity Commission ("EEOC") and the District responded outlining the reasons for their decision to terminate.  (*See* Defs.' Mot. Summ. J., Ex. 21, at 204.)  The EEOC dismissed the complaint in July 2020 without investigating and without making a determination as to Willman's rights.[2]  (Defs.' Mot. Summ. J., Ex. 23, at 235.)

### E.  Workers' Compensation Dispute

Willman was on FMLA leave from November 12, 2019, to January 12, 2020, but she did not return to work because she had been placed on a leave of absence.  (Willman Decl. ¶ 14.)  Willman was on leave while recovering from surgery for injuries that dated

---

[2] This does not mean that Willman's claims had no merit.  (See Defs.' Mot. Summ. J., Ex. 23, at 235.)

back to December 2018. (*Id.* ¶ 10.) Willman had submitted a workers' compensation injury report for that injury. (Defs.' Mot. Summ. J., Ex. 4, at 113–14.) Willman submitted a second workers' compensation injury report on December 6, 2018, after pinching the same hand injured in the first incident while moving a desk in her classroom. (*Id*. at 115–16.) She received workers' compensation for these injuries. (Defs.' Mot. Summ. J., Ex. 22, ¶¶ 4–5, at 223.)

In October 2019, the District's insurer determined that Willman had reached the maximum medical coverage for the injuries she sustained in December 2018. (Defs.' Mot. Summ. J., Ex. 24, at 238.) Therefore, the insurer denied any further benefits. (*Id.*) Willman challenged that denial and on December 17, 2019, her attorney mailed a Workers' Compensation Claim Petition ("Claim Petition") to the District and its insurer. (Defs.' Ex. Mot. Summ. J., Ex. 13, at 133.) The workers' compensation claim was litigated and settled in July 2020. (*See* Defs.' Mot. Summ. J., Ex. 22, at 222.)

## II.   PROCEDURAL HISTORY

Willman filed the present suit on June 30, 2021, in state court. (*See generally* Compl.) Willman brought claims alleging discrimination in violation of the Minnesota Human Rights Act ("MHRA") and the ADA, FMLA interference and retaliation, Workers' compensation reprisal, age discrimination, and defamation. (Compl. ¶¶ 42–78.) Each claim was against both Defendants. (*Id.* at 10–11.) Defendants removed to federal court on July 29, 2021. (Notice of Removal, July 29, 2021, Docket No. 1.) Defendants then brought a Motion for Partial Dismissal seeking to dismiss Willman's MHRA age and

disability discrimination claims against both Defendants, the disability discrimination claim under the ADA against the District, and the federal age discrimination claim against both Defendants. (Defs.' Partial Mot. Dismiss, Nov. 19, 2021, Docket No. 15.) The Court granted the partial motion to dismiss. *See Willman v. Farmington Area Pub. Sch. Dist. (ISD 192)*, No. 21-1724, 2022 WL 4095952, at *7 (D. Minn. Sept. 7, 2022). The District moved for summary judgment on all remaining claims on August 8, 2022. (Defs.' Mot. Summ. J., Aug. 8, 2022, Docket No. 34.)

## DISCUSSION

### I.   STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's

position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

## II.   ANALYSIS

### A.  FMLA Claims

The FMLA entitles eligible employees to twelve weeks of unpaid leave during a twelve-month period under certain circumstances.  29 U.S.C. § 2612(a)(1).  One of the permissible circumstances is "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  The FMLA permits employees to bring a private right of action if the employer interferes with or retaliates against the employee because they exercised their rights under the act.  *Thompson v. Kanabec County*, 958 F.3d 698, 705 (8th Cir. 2020); *see also* 29 U.S.C. § 2615.  Willman brings both an interference and retaliation claim, therefore the Court will address each claim.

### 1.  FMLA Interference

To succeed on an FMLA claim of interference, an employee must show that: (1) they were eligible for FMLA leave; (2) the employer knew the employee needed FMLA leave; and (3) the employer denied the employee an FMLA benefit to which they were entitled.  *Smith v. AS America, Inc.*, 829 F.3d 616, 621 (8th Cir. 2016); s*ee also Ballato v. Comcast Corp.*, No. 09-2236, 2011 WL 2728265, at *6 (D. Minn. July 13, 2011), *aff'd* 676 F.3d 768 (8th Cir. 2012) ("To succeed on a claim for interference, [plaintiff] must establish that [they were] entitled to a benefit that was denied.").  Additionally, "a claim for

interference will fail unless the employee also shows that the employer's interference prejudiced the employee as the result of a real, remediable impairment of [their] rights under the FMLA." *Thompson*, 958 F.3d at 705–06 (quoting *Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1160 (8th Cir. 2016).

The parties agree that Willman was eligible for FMLA leave based on her injured hand and the District does not dispute that it knew she needed FMLA leave. Additionally, there is no dispute about whether Willman received FMLA leave. In fact, not only was her FMLA request approved, but it was also extended. Willman received the time she requested.

Nevertheless, Willman argues that Defendants interfered with her FMLA request because Principal Blazek initially refused to sign Willman's FMLA form, demanded that Willman find her own substitute teacher, and provide an exact return work date before Blazek would sign it. However, even assuming that Defendants' delay in approving the FMLA request constitutes a "denial," Willman's claim fails as a matter of law because she has not shown any prejudice as a result of the delay. She ultimately received the requested leave time. Therefore, the Court will grant Defendants' Motion for Summary Judgment on the FMLA interference claim.

### 2. FMLA Retaliation

The FMLA retaliation claim revolves around the same facts as the FMLA interference claim but is focused on the events after her leave was granted. Section 2615(a)(2) of the FMLA makes it unlawful for "any employer to discharge or in any other

manner discriminate against any individual for opposing any practice made unlawful" by the FMLA.  29 U.S.C. § 2615(a)(2); see *also Brown v. Diversified Distrib. Sys., LLC*, 801 F.3d 901, 907 (8th Cir. 2015).  There are two ways to prove an FMLA retaliation claim: (1) through direct evidence of retaliation, or (2) under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03 (1973).  *Phillips v. Mathews,* 547 F.3d 905, 912 (8th Cir. 2008) (applying the *McDonnell Douglas* burden-shifting framework to an FMLA retaliation claim).

### a.    Direct Evidence

Direct evidence of retaliation or discrimination can be found when the plaintiff provides evidence of a specific link between the "discriminatory animus and the challenged decision" and may include evidence of "conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude."  *Thomas v. Heartland Emp. Servs. LLC*, 797 F.3d 527 (8th Cir. 2015) (internal quotation omitted).  The Court finds that Willman has not provided sufficient evidence of a direct link between her FMLA request and her termination.

Willman argues that she was not under any type of investigation prior to going on FMLA leave, and that after she requested her leave, she was placed on a performance improvement plan—that subsequently became part of the basis for her termination—constitutes direct evidence of retaliation.  "An employee's request for FMLA does not insulate [them] from employment decisions that are based on reasons other than FMLA usage . . . if the employer demonstrates that it would have terminated the

-15-

employment had the employee not exercised her FMLA rights, then the employer faces no liability." *Thompson*, 958 F.3d at 708 (quoting *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 923 (8th Cir. 2014)). Thus, neither the performance improvement plan nor the investigation can be considered adverse actions against Willman if there is an independent basis for them.

Willman also argues that Principal Blazek's actions constitute direct evidence of retaliation because she initially refused to sign the FMLA form, requested that Willman find a substitute and told Willman, "you are too old to do this job." Although the alleged discriminatory statement could reasonably form the basis for an age discrimination claim against Principal Blazek, it does not constitute direct evidence of retaliation because too much time passed between when the alleged statement was made and Willman's termination. *Cf. Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'") (citing *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (Tenth Cir. 2001)). Lacking direct evidence of discrimination, the Court now turns to the *McDonnell Douglas* framework for indirect evidence of discrimination.

### b.    Circumstantial Evidence

Under the *McDonnell Douglas* burden-shifting framework for indirect discrimination, an employee must first establish a prima facie case, which requires a

showing that the employee: (1) engaged in protected activity under the FMLA, (2) suffered a materially adverse employment action, and (3) established a causal connection between the protected activity and the adverse employment action. *Thompson*, 958 F.3d at 707 (citation omitted). If Willman presents evidence to meet these three elements, the burden shifts to the Defendants, who must come forward with evidence of a legitimate, nondiscriminatory reason for the adverse action. *Brown*, 801 F.3d at 909. Defendants' burden "is not onerous and the showing need not be made by a preponderance of the evidence." *Wallace v. Sparks Health Sys.,* 415 F.3d 853, 860 (8th Cir. 2005) (citing *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005)). Finally, Willman bears "the ultimate burden of showing that the employer's proffered reason was a mere pretext for a retaliatory motive." *Id.*

As with the FMLA interference claim, there is no dispute that Willman engaged in protected activity under the FMLA. Additionally, there is no dispute that her termination constitutes an adverse employment action. Rather, the dispute revolves around whether Willman can establish causation and whether the District's reasons for termination are pretextual. The Court turns to causation first.

In *Smith v. Allen Health Sys., Inc.,* the Eighth Circuit explained that to establish causation on the basis of temporal proximity between an employer's knowledge of protected activity and an adverse action, the timing must be very close. 302 F.3d 827, 833 (8th Cir. 2002). The Eighth Circuit has found causation when proximity was a "matter

of weeks," but not so when the interval was of two months between the complaint and the termination.  *Id.*  They explained that 14 days between the start of FMLA leave and termination was "sufficient, but barely so, to establish causation."  *Id.*

In this case, the relevant events are the time when Willman first requested her FMLA leave on October 10, 2019, and the time when the district moved to terminate her on January 28, 2020.  This timeframe is significantly longer than the 14 days the Eighth Circuit found to be "barely sufficient," and therefore too much time to establish causation.

Even if the Court were to find that the temporal proximity was enough to establish causation, Willman's FMLA retaliation claim fails because the District provided sufficient reasons to justify the termination.  *See Phillips*, 547 F.3d at 912 (foregoing an analysis of temporal proximity because the employer had put forward a legitimate reason for the termination and the evidence of pretext was weak).  The District points to the reasons included in the termination letter sent on January 28, 2020, which included various performance concerns dating back to the 2018-2019 school year, parental concerns, lack of knowledge of IEP goals, deficient IEP documentation, and other facially legitimate reasons.  These were presented to the School Board, which subsequently voted to terminate Willman.  The Court concludes that Defendants have met their burden and provided sufficient legitimate reasons for Willman's termination.  Willman has failed to show circumstantial evidence under the *McDonnell Douglas* burden-shifting framework.

-18-

### c.    Pretext

Lastly, Willman may refute the Defendants' reasons for termination if she can successfully "identify evidence sufficient to create a genuine issue of material fact" on whether the "proffered explanation is merely a pretext for unlawful retaliation." *Brown,* 801 F.3d at 909 (internal quotation omitted).  This entails a showing that the employer's explanation is unworthy of credence because it has no basis in fact or by persuading the Court that a prohibited reason more likely motivated the employer.  *Id.*  The Court's inquiry is "limited to whether the employer gave an honest explanation of its behavior, not whether its action was wise, fair, or correct."  *McKay v. U.S. Dep't of Transp.*, 340 F.3d 695, 700 (8th Cir. 2003) (internal quotation omitted).  In other words, the Court is not in a position to re-conduct any investigation into an employee.  Instead, courts typically find evidence of pretext where an employee shows that the employer "(1) failed to follow its own policies, (2) treated similarly situated employees in a disparate manner, or (3) shifted its explanation of the employment decision."  *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874–75 (8th Cir. 2010).

Although Willman takes issues with many of the reasons provided by the District for termination, she has not presented evidence that the District did not follow its own policies, treated similarly situated employees differently, or shifted its explanations. Accordingly, Willman has not presented evidence of pretext and the Court will grant summary judgment on the FMLA interference claim.

**B.  Workers' Compensation Retaliation**

The Court next considers Willman's claim that she was retaliated against due to her Workers' Compensation Act ("WCA") Claim Petition.  The WCA provides: "Any person discharging an employee for seeking workers' compensation benefits . . . is liable in a civil action for damages incurred by the employee[.]"    Minn. Stat. § 176.82, subd. 1. Retaliation to workers' compensation claims in Minnesota are analyzed under the *McDonnell Douglas* burden-shifting framework like the FMLA claims.  *See Kunferman v. Ford Motor Co.*, 112 F.3d 962, 965 (8th Cir. 1997).  Thus, a plaintiff must either show direct evidence of retaliation or set forth a prima facie case for indirect discrimination.  Although related, the factual allegations in Willman's workers' compensation claim are different than in her FMLA retaliation claim.  Specifically, for the purpose of the workers' compensation claim, the relevant events are the time when Willman submitted the Workers' Compensation Claim Petition on December 17, 2019, after further workers' compensation benefits were denied, and the time when the District moved to terminate her.

**1.  Direct Evidence**

First, Willman claims that there is direct evidence of reprisal.  Specifically, she points to the "summary of discipline" dated 1/27/2020, which was presented to the Board, and included the following:

> Mary had 2 minor hand injuries (by a student) in December 2018.  She received some medical treatment for them for a few months.  Workers (sic) comp ended her treatment and

> refused her carpal tunnel surgery as not related to the
> injuries. She went ahead with the surgery in November under
> her medical insurance and has been out of work recovering
> since the surgery (mostly with no pay since she ran out of sick
> leave and it was determined not to be work comp related).
> She has obtained a lawyer as she objects to the determination
> that the carpal tunnel was not work related.

(Everson Decl., Ex. X, at 15, Nov. 4, 2022, Docket No. 61-2.) Willman contends that there

was no legitimate reason to include this information if it were not part of the reason for

her termination. Although the summary mentions the Workers' Compensation Petition

Claim, it is not in relation to the reasons for termination. The summary provided

background information, and the workers' compensation background was necessary for

a comprehensive summary of the investigation into Willman. Therefore, the Court

concludes that this does not constitute direct evidence of reprisal. The Court will now

turn to the *McDonnell Douglas* framework.

### 2. Prima Facie Case

Once again, the parties do not dispute that Willman engaged in protected

behavior—receiving worker's compensation—or that she was subject to an adverse

employment action—her termination. The dispute revolves on whether there is a casual

connection between the protected activity and the adverse action. The parties again

disagree on the relevant events.

The Court agrees with Willman that the relevant event here occurred on December

17, 2019, when the district received her Workers' Compensation Claim Petition after the

District's insurer denied further workers' compensation benefits. However, that occurred

-21-

more than a month before the District moved to terminate her on January 28, 2021.  The timeline is too attenuated.  Willman also attempts to connect the Claim Petition to the investigation that was initiated on December 18, 2020, by Principal Blazek.  But as previously explained, the investigation itself cannot be considered an adverse action against Willman given the District's legitimate concerns with her teaching.

Additionally, even if the Court were to assume that a causal connection has been established, the workers' compensation claim fails for the same reason that the FMLA claim fails: Willman has not presented sufficient evidence to put into question whether the reasons for her termination were pretextual.  The Court will therefore grant the Defendants' summary judgment motion as to this claim.

### C. Defamation

The Court now turns to Willman's defamation claim.  Because the Court is dismissing all claims except for her state law defamation claim, it must first determine whether to exercise supplemental jurisdiction over the matter.

"Under 28 U.S.C. § 1367, in any civil action in which the district courts have original jurisdiction, they shall also have supplemental jurisdiction over all other claims so related to the claims in the original jurisdiction that they form part of the same case or controversy." *Thomas v. United Steelworkers Loc. 1938*, 743 F.3d 1134, 1141 (8th Cir. 2014) (citation omitted).  The Court has original jurisdiction over the FMLA claims and supplemental jurisdiction over the defamation and workers' compensation claims because they were part of the same case and controversy surrounding Willman's

termination.  "If the district court dismisses every claim over which it had original jurisdiction, the court maintains its broad discretion to exercise supplemental jurisdiction over any remaining state-law claims." *Id.* (citation omitted).

In this case, the Court exercises its discretion to maintain supplemental jurisdiction over the defamation claim because the record has been fully developed and the principles of state law are not in dispute.  *Id.* (finding the district court properly maintained supplemental jurisdiction because of the "substantial amount of time and judicial resources expended in this case and the well-settled principles of state law concerning defamation").

Under Minnesota law, defamation requires proof that the alleged defamatory statement "(1) was communicated to someone other than the plaintiff, (2) was false, and (3) tended to harm the plaintiff's reputation and lower [the plaintiff] in the estimation of the community." *Id.* at 1142 (citation omitted).  In this case, the dispute centers on whether District employees presented false statements in the reasons for Willman's termination.

Willman alleges that the Summary for Discipline, the Termination Letter, and the submission to the PELSB, each contain defamatory statements.  Specifically, Willman alleges that District staff both left out pertinent information and provided the Board with false and misleading information.  In support, Willman points to the testimony of the School Board Chair.  The School Board Chair reviewed Willman's evaluations and

compared them to the termination letter, which summarized the evaluations.  The School Board Chair then testified that the letter did not accurately depict them.  Additionally, Willman points to evidence that the District was aware of the issues with the student who repeatedly exposed himself and misrepresented that information to the Board.  Finally, Willman claims that she did in fact implement the veteran teacher's suggestions, even though the District had communicated to the Board that she had not.

The Court concludes that genuine disputes of material issues of fact remain regarding whether the District employees knew some of the information provided to the Board was false.  This claim is well-suited for a jury.  However, for the sake of completeness, the Court will address the privileges and immunities the Defendants raise.

### 1.  The Board and Superintendent

Defendants argue that communications to the School Board and Superintendent cannot give rise to liability because they are immune under qualified privilege.  In Minnesota,

> [t]he law is that a communication, to be privileged, must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause.  When so made in good faith, the law does not imply malice from the communication itself, as in the ordinary case of libel.  Actual malice must be proved, before there can be a recovery, and in the absence of such proof the plaintiff cannot recover.

*McBride v. Sears, Roebuck & Co.*, 306 Minn. 93, 96–97 (Minn. 1975).  Therefore, communications between an employer's agents are generally entitled to qualified

privilege if "made in the course of investigating or punishing employee misconduct [and] made upon a proper occasion and for a proper purpose, as the employer has an important interest in protecting itself and the public against dishonest or otherwise harmful employees." *Id*. at 97.

The communications to the Board and the Superintendent may be immune, but that depends on whether the allegedly defamatory statements were made with actual malice. In this case, Willman points to the alleged age-related statement by principal Blazek and the HR Director Thomas email discounting Willman's injury as evidence of malice. A malice determination is a fact intensive claim best left for the jury. *See Frankson v. Design Space Intern.,* 394 N.W.2d 140, 144 (Minn. 1986) ("Whether a qualified privilege has been lost through abuse, that is, by acting with actual malice, is a jury question.") Therefore, the Court will deny summary judgment on this claim.

### 2. PELSB

Defendants argue that they shielded from liability for the reports to PELSB under Minn. Stat. § 122A.20, subd. 3, which states that:

> A school board, its members in their official capacity, and employees of the district run by the board are immune from civil or criminal liability for reporting or cooperating as required . . . if their actions . . . are done in good faith and with due care.

Willman does not challenge the applicability of the Minnesota statute, but rather argues that the issue of whether Defendants acted in good faith and with due care is a factual determination not appropriate for summary judgment.

However, unlike the statements to the Board, the District was fulfilling a statutory duty when it submitted the information requested by PELSB. Willman has not put forth any evidence that the submission to PELSB was done with ill will or improper motive. Therefore, the Court concludes that no genuine issue of material fact regarding the submission to PELSB exists and will grant summary judgment on this claim.

### 3. EEOC

Willman has elected to not pursue the defamation claim based on statements to the EEOC. (Pl.'s Mem. Opp. Summ. J. at 43, Aug. 16, 2022, Docket No. 46.) Therefore, the Court will grant summary judgment as to this claim.

### D. Disability Discrimination under the ADA

At the motion to dismiss stage, the Court dismissed Willman's disability discrimination claims based on state law against both the District and Principal Blazek. See *Willman*, 2022 WL 4095952, at *7. The Defendants also moved to dismiss the federal discrimination claim under the ADA, **but only** against the District. (Defs.' Mot. Partial Dismissal at 1.) The Court granted that motion to dismiss. *Willman*, 2022 WL 4095952, at *7. Accordingly, the ADA discrimination claim against Principal Blazek remains. However, since Willman has not continued to prosecute this claim, the Court will *sua sponte* grant summary judgment to Defendants on the issue. Fed. R. Civ. P. 41(b); *See also Sterling v. U.S.*, 985 F.2d 411, 412 (8th Cir. 1993) (citations omitted) ("District courts have inherent power to dismiss sua sponte a case for failure to prosecute.").

-26-

**CONCLUSION**

Because no genuine issues of material fact remain with regard to the FMLA interference, FMLA reprisal, and workers' compensation reprisal claims, and because Willman cannot succeed on these claims as a matter of law, the Court grants summary judgment to Defendants on those claims.  The Court also grants summary judgment on the ADA disability discrimination claim for failure to prosecute.  However, genuine issues of material fact remain with regard to Plaintiff's defamation claim based on statements to the School Board and Superintendent.   Therefore, the Court will deny summary judgment with respect to the defamation claim.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

1.  Defendant's Motion for Summary Judgment [Docket No. 34] is **GRANTED** as to Plaintiff's FMLA interference and reprisal (Count Two), Workers' Compensation reprisal (Count Three), and ADA discrimination claims (Count Four).

2.  Defendant's Motion for Summary Judgment [Docket No. 34] is **DENIED** as to Plaintiff's defamation claim (Count Five) based on statements to the Board and Superintendent.

3. The case will be placed on the Court's next trial calendar.


DATED:  February 9, 2023
at Minneapolis, Minnesota.                         JOHN R. TUNHEIM
                                          United States District Judge